1998 ND 192

Rachel M. KAUTZMAN, Plaintiff,
Appellee, and Cross–
Appellant,

v.

Robert A. KAUTZMAN, Defendant,
Appellant and Cross–Appellee.

Civil No. 980004.

Supreme Court of North Dakota.

Oct. 30, 1998.

Pamela J. Hermes, of Vogel, Weir, Bye, Hunke & McCormick, Ltd., Fargo, for plaintiff, appellee and cross-appellant.

Wayne T. Anderson (argued), Fargo, Mark R. Fraase (submitted on brief), and Douglas W. Nesheim (submitted on brief), of Wegner, Fraase, Nordeng, Johnson & Ramstad, Fargo, for defendant, appellant and cross-appellee.

NEUMANN, Justice.

[¶ 1] Robert A. Kautzman appealed from an order denying his motion for a new trial and from the second amended judgment entered in Rachel M. Kautzman's divorce action. Rachel Kautzman cross-appealed from the second amended judgment and from orders denying her post-trial motions. We affirm in part, reverse in part, and remand for further proceedings.

[¶ 2] Robert and Rachel began living together in 1978 and married in 1988. They built a construction company (Kautzman Construction or KCI), which they incorporated in 1989. The parties separated in January 1995, and Rachel sued for a divorce. No children were born of the marriage.

[¶ 3] After a lengthy trial, the trial court made findings of fact, conclusions of law, and ordered judgment. After the judgment was entered, and after the court ruled on post-trial motions and issued amended findings and conclusions, a second amended judgment was entered. That judgment granted Rachel a divorce, awarded spousal support to Rachel, and divided the marital property.

[¶ 4] The trial court ordered Robert to pay Rachel spousal support of $4,000 per month through December of 2002, "with $2,000 of said amount being for rehabilitative purposes, and thereafter he shall pay her the sum of $2,000 per month in spousal support." In dividing the marital property, the second amended judgment awarded Rachel property valued at $470,160 and awarded Robert property valued at $1,512,720. Robert was ordered to pay Rachel $200,000 within 60 days and an additional $180,000 within four years. Included in the property awarded to Robert was KCI, which the judgment valued at $581,860. Using the value of $581,860 for KCI, and the cash payments Robert is required to give Rachel, without reducing them to present value, Rachel received property valued at $850,160 and Robert received property valued at $1,132,720. By order of December 31, 1997, the trial court ordered finding of fact number 47 amended to value KCI, at "at least $301,001.58." Use of that value results in a property award of $850,160 to Rachel and $851,962 to Robert.[1]

[¶ 5] Robert appealed, challenging the property distribution and the spousal support award. He asserts the trial court used an inequitable property division and an unfair spousal support award to punish him for perceived disrespect toward the court. Rachel's cross-appeal challenges the court's valuation of KCI, its failure to require Robert to return $50,000 withdrawn from a savings account or to clarify the judgment in that respect, and its failure to award her attorney fees. She also seeks attorney fees on appeal.

### I. Robert's Appeal

#### A. Property Division

[¶ 6] Robert contends the property division is clearly erroneous because the trial court erroneously found a premarital partnership, failed to consider the source of property brought into the marriage, failed to consider Rachel's lack of contribution to increasing the marital assets during the pendency of the

---

1. This is consistent with the trial court's finding of fact that "[i]t is fair and equitable under the *Ruff–Fischer* guidelines to award to Rachel property and property distribution payments with a value equal to roughly 50% of the total value of the assets which existed at the time of the trial."

divorce, and otherwise failed to consider all of the appropriate factors. We reject all of those contentions.

[¶ 7] Under N.D.C.C. § 14–05–24, "[w]hen a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper." "In reviewing a property division, we start with the view that marital property should be equally divided and, while the division need not be exactly equal to be equitable, the trial court must explain any substantial disparity." *Christmann v. Christmann,* 1997 ND 209, ¶ 6, 570 N.W.2d 221.

[¶ 8] A trial court's determinations on valuation and division of property are treated as findings of fact and will be reversed on appeal only if they are clearly erroneous. *Wilhelm v. Wilhelm,* 1998 ND 140, ¶ 11, 582 N.W.2d 6; *Kluck v. Kluck,* 1997 ND 41, ¶ 25, 561 N.W.2d 263. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence the reviewing court is left with a definite and firm conviction a mistake has been made. *Gierke v. Gierke,* 1998 ND 100, ¶ 15, 578 N.W.2d 522. A trial court's findings of fact are presumed to be correct. *In re Estate of Helling,* 510 N.W.2d 595, 597 (N.D.1994). If a party does not challenge specific findings of fact, we will not review them. *Wagner v. Wagner,* 1998 ND 117, ¶ 9, 579 N.W.2d 207; *Helling,* 510 N.W.2d at 597.

[¶ 9] In distributing marital property, the trial court must use the guidelines established in *Ruff v. Ruff,* 78 N.D. 775, 52 N.W.2d 107 (1952), and *Fischer v. Fischer,* 139 N.W.2d 845 (N.D.1966). *Freed v. Freed,* 454 N.W.2d 516, 520 (N.D.1990). The *Ruff–Fischer* guidelines allow a court to consider a number of factors:

> These guidelines allow the trial court, in making a property distribution, to consider the respective ages of the parties to the marriage; their earning abilities; the duration of the marriage and the conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical conditions; their financial circumstances as shown by the property owned at the time; its value and income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage; and such other matters as may be material. *Volk v. Volk,* 376 N.W.2d 16, 18 n. 2 (N.D.1985).

*Freed,* 454 N.W.2d at 520 n. 3.

[¶ 10] "To make an equitable distribution of property under NDCC 14–05–24, the trial court must include in the marital estate all of the parties' assets, regardless of source." *Zuger v. Zuger,* 1997 ND 97, ¶ 8, 563 N.W.2d 804. "A spouse need not make a direct contribution to the acquisition of an asset for it to be included in the marital estate." *Zuger,* at ¶ 8. "An asset accumulated after the spouses have separated, but while the marriage still exists, is includable in the marital estate." *Zuger,* at ¶ 8. "Ordinarily, property acquired while living separately is accountable to satisfy obligations which arise out of the status of marriage." *Hoge v. Hoge,* 281 N.W.2d 557, 561 (N.D.1979).

[¶ 11] Where a homemaker's contributions to the family enable the other spouse to devote full time and attention to a business, contributing to the accumulation, appreciation, and preservation of assets, the homemaker's contributions deserve equivalent recognition in a property distribution upon dissolution of the marriage. *Young v. Young,* 1998 ND 83, ¶ 15, 578 N.W.2d 111; *Behm v. Behm,* 427 N.W.2d 332, 337 (N.D. 1988). A traditional homemaker's contributions are an asset to the enterprise of marriage and should be recognized in a property distribution upon dissolution of the marriage. *Volk v. Volk,* 404 N.W.2d 495, 498 (N.D.1987). A difference in earning capacity should be taken into consideration in determining a property division. *Nastrom v. Nastrom,* 284 N.W.2d 576, 582 (N.D.1979).

[¶ 12] In light of the factors to be considered in making or reviewing a property distribution, Robert has a heavy burden to overcome the presumption of correctness we accord to a trial court's property distribution.

[¶ 13] Relying on *Kohler v. Flynn,* 493 N.W.2d 647, 649 (N.D.1992), Robert ar-

gues our law on equitable distribution of marital property does not apply to the breakup of other living arrangements and the time he and Rachel lived together before marrying should not be a factor in the property distribution. While our law on equitable distribution of marital property upon dissolution of a marriage does not apply to the breakup of other living arrangements, we have said time spouses lived together before marriage may be considered in distributing property. "When parties live together and then marry it is appropriate for the court to consider all of their time together in dividing the marital property." *Nelson v. Nelson*, 1998 ND 176, ¶ 7, 584 N.W.2d 527. In *Braun v. Braun*, 532 N.W.2d 367 (N.D.1995), the parties began living together in 1986, married in 1988, and divorced in 1994. The husband argued he was "entitled to everything he had when their marriage began in 1988, and that only the net increase since then should be divided equally." *Id.*, at 371. We said: "But when spouses live together for a time, have children together, and then marry, the trial court may properly consider all of their time together." *Id.* Robert would distinguish those cases because he and Rachel had no children. We are not persuaded the parties' failure to have children renders the time they lived together before marrying beyond the trial court's consideration in making an equitable distribution of their property.

[¶ 14] The trial court found, among other things:

7. The parties lived with each other from about 1978 on. From the time the parties started residing together, they were, in effect, a financial partnership or community, having agreed to share expenses and assets. Although there was no written contract between the parties, their conduct from 1978 up until immediately prior to their separation was consistent with such an agreement.

. . . .

34. At the time of trial, the parties had been married for about nine years, but they had been a defacto [sic] business and financial partnership for about nineteen years.

Robert contends "the facts simply do not support the trial court's finding that there was some sort of premarital partnership."

[¶ 15] While a property distribution upon the dissolution of a marriage is based upon equitable principles, rather than on partnership law, we note that the evidence and other findings, not specifically objected to by Robert and, therefore, presumed correct, support the trial court's determination the parties had a financial partnership. For a partnership to exist, there must be an intention to be partners, a profit motive, and co-ownership of the business, including a sharing of profits and losses. *Tarnavsky v. Tarnavsky*, 147 F.3d 674 (8th Cir.1998); *Gangl v. Gangl*, 281 N.W.2d 574 (N.D.1979). The trial court found:

9. In approximately 1980, the parties started Kautzman Construction. Rachel's savings, which had primarily been accumulated before the parties started living together, were used to fund the start up of the company. Rachel did most of the bookwork for the company during the first few years, working at night and on weekends while maintaining a full-time job elsewhere in the day. Robert attracted the business and provided the labor for the company. He reported the income from the company on his individual tax returns, but the parties shared the profits.

10. Kautzman Construction became increasingly profitable as a result of the parties' mutual efforts and hard work. In 1983, Rachel quit her other job and started working full-time for the company. Robert then commenced paying her a regular salary, and the parties continued to share in the profits generated by the business.

11. Rachel worked full-time as a secretary/office manager for Kautzman Construction from mid–1983 until the parties' separation, doing much the same things as have been done by one or another full-time employee since that time. Rachel did almost all of the parties' homemaking throughout their relationship until about the time of the parties' separation. . . .

. . . .

14. Throughout the parties' relationship and until the fall of 1994, when the

marital difficulties between the parties escalated, Robert acknowledged that Rachel owned half of the parties' property and that she had made substantial contributions to the assets accumulated by the parties, including Kautzman Construction. Those findings are supported by the evidence, and they support the trial court's determination that Rachel and Robert had a business and financial partnership before and during their marriage.

[¶ 16] Furthermore, those findings and a number of others indicate the trial court properly considered the appropriate factors under the *Ruff–Fischer* guidelines in determining the equitable distribution of property. The trial court found: (1) "the parties have accumulated substantial wealth and have little debt;" (2) almost everything the parties have was acquired with earnings generated by KCI; (3) "Robert was verbally and emotionally abusive to Rachel throughout the parties' relationship;" (4) "The marriage was irretrievably broken down on or about December 23, 1994, when Robert threatened to kill Rachel;" (5) Robert's "misconduct and/or dissipations of assets resulted in losses to the marital estate of at least $250,000 from January 1, 1995 through December 31, 1996, and that further dissipations continued through the time of trial;" (6) "Rachel has not been guilty of any significant post-separation dissipation of assets;" (7) Rachel is 41 years old, has a high school education, has been employed only by KCI since 1983, has few marketable skills, a present earning capacity of $15,000 per year, which, even with retraining will be no more than $30,000 per year; (8) Robert is 48 years old, his "earning capacity ... produced earnings/income of about $400,000 through Kautzman Construction in 1996;" (9) Rachel and Robert are both in relatively good health; (10) "Robert's claim that he personally had assets totalling $1,037,897 before the parties' marriage is not supported by credible evidence;" (11) "Although it appears that the financial accounts and assets specifically held in Robert's name exceeded those held in Rachel's name prior to the marriage, the difference is substantially offset by Robert's pre-marriage tax obligations which were paid after the parties' marriage;" (12) "Rachel's

efforts, both before and after the marriage, allowed Robert to devote more time to the business;" and (13) "It is fair and equitable under the *Ruff–Fischer* guidelines to award to Rachel property and property distribution payments with a value equal to roughly 50% of the total value of the assets which existed at the time of the trial."

[¶ 17] We are not persuaded the trial court failed to consider any factors appropriate under the *Ruff–Fischer* guidelines in making an equitable distribution of the parties' marital property. As in *Christmann v. Christmann*, 1997 ND 209, ¶ 7, 570 N.W.2d 221, Robert "has failed to meet his burden of establishing in what particular respect the property division is clearly erroneous or what relevant factors under the *Ruff–Fischer* guidelines, allegedly ignored by the trial court, would have justified a greater property award for" Robert. We conclude Robert has failed to overcome the presumption of correctness we accord to a trial court's property distribution.

### B. Spousal Support

[¶ 18] The trial court awarded Rachel rehabilitative spousal support of $2,000 per month from December 1, 1997, through December 2002, and additional spousal support of $2,000 per month from December 1, 1997, until she reaches age 65, dies, or remarries after December 21, 2002. Robert contends the spousal support award is grossly unfair and unsupported by appropriate rationale.

[¶ 19] Spousal support determinations are treated as findings of fact and will not be reversed or disturbed on appeal unless they are clearly erroneous. *Young v. Young*, 1998 ND 83, ¶ 7, 578 N.W.2d 111; *Zuger v. Zuger*, 1997 ND 97, ¶ 17, 563 N.W.2d 804. "An award of spousal support must be made in light of the needs of the disadvantaged spouse and of the supporting spouse's needs and ability to pay." *Mahoney v. Mahoney*, 1997 ND 149, ¶ 28, 567 N.W.2d 206. Rehabilitative spousal support is ordered to give a disadvantaged spouse an opportunity to become adequately self-supporting through additional training, education, or experience. *Mahoney*, at ¶ 28;

*Zuger,* at ¶ 18. "A spouse's need for rehabilitation is not limited to the prevention of destitution." *Mahoney,* at ¶ 28. "Continuance of a standard of living is a valid consideration in a rehabilitative spousal support determination." *Id.* "Permanent spousal support is ordered to maintain a somewhat comparable standard of living for a spouse who is incapable of adequate rehabilitation." *Zuger,* at ¶ 18. Permanent spousal support is appropriate when there is a substantial disparity between the earning abilities of the spouses. *Zuger,* at ¶ 19.

[¶ 20] Rachel is 41 years old, has a high school education, and has been employed only by Kautzman Construction since 1983. The trial court found she has few marketable skills, a present earning capacity of $15,000 per year, and, even with retraining, will have an earning capacity of no more than $30,000 per year. The trial court found KCI, in which Rachel will no longer have an interest, "provided earnings/income in 1996 equivalent to about $400,000," which represents Robert's earning capacity. Almost everything the parties have was acquired with earnings generated by KCI. The trial court found "[t]he parties have enjoyed a very comfortable standard of living, particularily in recent years, and their lifestyle has been consistent with their substantial income." Rachel was disadvantaged by the divorce, and her earning capacity will never approach Robert's. "[I]n light of the disadvantaged spouse's needs and the supporting spouse's needs and ability to pay," *Young,* at ¶ 7, "[s]pousal support was appropriate to allow [Rachel] to continue her accustomed standard of living," *Behm v. Behm,* 427 N.W.2d 332, 334 (N.D. 1988). We conclude the trial court's spousal support determinations are not clearly erroneous.

### C. Punishment

[¶ 21] Robert contends the trial court used an inequitable property division and an unfair spousal support award to punish him for perceived disrespect toward the court. In light of Rachel's needs and Robert's needs and ability to pay, the trial court's spousal support award is not unfair to Robert. In reviewing a property distribution, we begin with the view that marital property should be equally divided and substantial disparities must be explained. The trial court awarded more than half of the parties' property to Robert. It is apparent the trial court did not punish Robert through an inequitable property division for disrespect shown to the court by Robert.

### II. Rachel's Cross-appeal

[¶ 22] In her cross-appeal, Rachel contends the trial court erred in its valuation of KCI, erred in denying her request for a clarification of the judgment, and erred in rejecting her request for attorney fees. She also seeks attorney fees for this appeal.

### A. KCI Valuation

[¶ 23] The trial court originally found "it was not reasonably possible to make a precise accounting of the value of Kautzman Construction as of the time of trial" and found "that the value was at least $581,860.00." On November 21, 1997, Rachel moved for amended findings of fact, asserting in part:

[T]he Court's specific finding that the business was to be valued at $581,860, is inconsistent with the Court's determination that the parties' net marital estate at the time of trial was $1.62 million. Bob has apparently withdrawn about $50,000 out of one of the First National accounts to be transferred to Rachel and the Findings, Conclusion and Judgment should be amended to address this change, which was unknown to plaintiff until November 21, 1997, and other possible dissipations by Bob. The plaintiff requests that the Court amend and clarify its findings to address the inconsistency and to amend the Judgment appropriately.

In her supporting brief, Rachel asserted the special master's $301,001.58 valuation of KCI as of December 31, 1996, was wrong, and should have been $385,860 because of additional work in progress, prepaid expenses, and receivables. An exhibit with the brief suggested $196,000 in 1997 earnings should also be included in valuing KCI.

[¶ 24] Robert also moved to amend the trial court's findings of fact. He asserted in his supporting brief:

An even worse error was made by the Court when it accepted the $581,860. figure advocated by Plaintiff's counsel as the value of the business. In order to arrive at that figure, Plaintiff added amounts relating to the income of the construction company. However, the money reflecting this income was in accounts which are elsewhere included in the marital estate. The result is that close to $200,000. worth of property was added twice to the estate. This is clear error.

[¶ 25] The trial court responded to the parties' motions by amending the finding valuing KCI to read: "In light of all the evidence, it is reasonable to conclude that the value was at least $301,001.58." In her principal brief on appeal, Rachel contends:

Although the Master's valuation of KCI as of 12/31/96 was $301,001, the Master did not have some of the records that Rachel was able to obtain through trial subpoenas. As reflected on Ex. B to Rachel's post-trial brief, the value of KCI as of 12/31/96 was at least $385,860. App. 378. *See* DN 354, pp. 4–11, Ex. B. The records admitted in evidence at trial show that the a[sic] net difference of $31,117 in additional Work in Progress (WIP) should have been added; plus a prepayment of Northern Pipe expenses in the amount of $43,576 (which was undisputed at trial after testimony was subpoenaed from Northern Pipe, but which was unknown to the Master); plus $10,166 in receivables which the Master did not include as an asset because he considered it a "dissipation." *See* Pl. Posttrial brief, DN 354, pp. 4–11, Ex. B and Pl. Brief in Support of Motion/Application for Amended Findings, DN 366, which are incorporated herein by reference. Because the Master applied a liquidation approach, it would be clearly erroneous not to add these amount[s] to the value of KCI as of 12/31/96.

[¶ 26] Robert has not challenged Rachel's evidence and argument about the work in progress, prepaid expenses, and receivables not available to the special master in valuing KCI as of December 31, 1996. We conclude the trial court's valuation of Kautzman Construction is clearly erroneous because it does not include the $84,859 ($31,117 plus $43,576 plus $10,166) sought to be added by Rachel.[2]

[¶ 27] In her reply brief, Rachel contends the trial court's valuation of KCI should be increased by an additional $196,000:

The annual net income/earnings available from KCI were $267,576 in 1995 and about $400,000 in 1996,.... Using a factor of .75 for the first 9 months of the year, 1997 net earnings before owner compensation equaled roughly $300,000 through the end of trial. Robert's compensation in that same time period was $100,000, leaving estimated earnings after Robert's compensation through the time of trial of $200,000. Less than $4,000 in assets were added to the balance sheet from 1997 expenditures out of KCI, ..., leaving $196,000 unaccounted for. The trial court added nothing to the value of KCI for 1997 earnings, and did not otherwise factor the unaccounted earnings into its decision. Because evidence of past earnings/income provide a good basis upon which to estimate the 1997 earnings, the trial court should have added the $196,000 to the value of KCI or otherwise factored 1997 estimated earnings into its decision.

[¶ 28] The trial court's valuation of KCI as of December 31, 1996, does not include 1997 earnings retained from revenue generated in 1997 up to the time the trial was completed in September 1997. The trial court found Robert's "earning capacity ... produced earnings/income of about $400,000 through Kautzman Construction in 1996." At trial,

---

**2.** The trial court's valuation adopted the special master's valuation of KCI on December 31, 1996, as $301,001.58, which, as the court noted in Finding 24, was based upon "a liquidation value approach and did not attribute any good will to the company." "[L]iquidation value is the least favored method of valuing any type of marital property in a divorce." *Welder v. Welder*, 520 N.W.2d 813, 817 (N.D.1994). Ordinarily, fair market value, rather than liquidation value, is the proper method of valuing marital property in a divorce. *Kaiser v. Kaiser*, 474 N.W.2d 63, 68 (N.D.1991); *Heggen v. Heggen*, 452 N.W.2d 96, 99 (N.D.1990). While the parties have not challenged the liquidation value method of valuing KCI, liquidation value does not appear to be the best measure of KCI's value in light of the fact it was being retained after the divorce.

Rachel introduced evidence showing KCI sent to customers statements dating from January 8, 1997, to September 10, 1997, for well over $500,000. That evidence buttresses Rachel's argument KCI's net earnings in 1997 could be estimated at 75 percent of the 1996 earnings, less Robert's compensation. Our review has left us with a definite and firm conviction the trial court made a mistake in valuing KCI by not including retained earnings from 1997 revenue.

### B. Clarification of Judgment

[¶ 29] Rachel contends the trial court erred in denying her motion to amend the judgment with respect to Robert's post-trial withdrawal of $50,000 from a savings account ultimately awarded to Rachel. She asserts "[t]he Judgment was worded as if all the accounts to be transferred to Rachel remained intact," and "[t]he court should have required the money to be returned or, at least, clarified the langauge of the judgment."

[¶ 30] Rachel recognized in her brief that "Robert acknowledged a duty to return the money." Robert responded in his reply brief:

The trial court made very clear that Robert was obligated to pay to Rachel those amounts awarded in the judgment.... Robert acknowledged through his attorney that he understood those obligations.

We are not persuaded the trial court abused its discretion in denying Rachel's motion to amend the judgment to further clarify Robert's duty to return to Rachel the withdrawn funds. Should Rachel experience the "significant problems in enforcing the judgment" she fears, she may seek redress from the trial court at that time.

### C. Attorney Fees in Trial Court

[¶ 31] Rachel contends the trial court abused its discretion in denying her request for attorney fees in the trial court proceedings.

[¶ 32] The trial court's decision on a request for attorney fees in a divorce action will not be disturbed on appeal unless it is affirmatively established by the party appealing that the trial court abused its dis-

cretion. *Jondahl v. Jondahl*, 344 N.W.2d 63, 73 (N.D.1984). An award of attorney fees in a divorce action under N.D.C.C. § 14–05–23 is within the sound discretion of the trial court and will not be set aside absent an abuse of discretion. *Young v. Young*, 1998 ND 83, ¶ 8, 578 N.W.2d 111. "A court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner or when its decision is not the product of a rational mental process." *Nastrom v. Nastrom*, 1998 ND 142, ¶ 7, 581 N.W.2d 919. The principal factors for consideration in awarding attorney fees in a divorce action are the parties' needs and ability to pay. *Mahoney v. Mahoney*, 1997 ND 149, ¶ 40, 567 N.W.2d 206. The trial court may also consider whether one party's actions unreasonably increased the time spent on the dispute. *Id.*

[¶ 33] In its original findings of fact, conclusions of law, and order for judgment, the trial court concluded:

4. ... Rachel shall be responsible for her MeritCare debt and for her own attorney's fees and costs; provided, however, that the Court will hold a separate hearing on fees and may make a separate award of attorney's fees and costs following this hearing.

. . . .

16. The issues of the reasonableness of attorney's fees and costs and the Special Master's fees and costs, whether there should be a separate award to either party for attorney's fees and costs relating to this litigation, and what further provisions, if any, should be made relative to the Special Master's fees and costs are reserved for a separate hearing by the Court, which shall be scheduled as soon as reasonably possible.

[¶ 34] Rachel moved for an award of attorney fees because, as she asserted in a trial court brief, "the conduct of Robert Kautzman has substantially increased the cost of litigation." At a hearing on the parties' post-trial motions, the trial court ruled the parties would pay their own attorney fees.

[¶ 35] The trial court made a number of relevant findings of fact:

18. Robert violated the Court's Interim Order in significant respects and failed to cooperate with the discovery process....

....

20. As a result of Robert's misconduct and in an attempt to expedite the litigation and minimize the costs relating to it, the Court appointed Leonard J. Sliwoski, CPA, as a Special Master. He was ultimately assigned the tasks of determining the parties' assets and liabilities ... the nature and extent of any dissipation of assets; ... annual income/earnings available to Robert through Kautzman Construction; and identifying other relevant matters that came to his attention during his investigation.

21. Robert failed to cooperate with the Special Master and the proceedings relating to his investigation. Among other things, Robert did not respond to the Special Master's requests for information, he ignored subpoenas, and he walked out of his deposition. Robert failed to comply with the Court's Further Orders entered in an effort to facilitate the Special Master's investigation and report. His further misconduct otherwise interfered with the Special Master's investigation and work, resulting in significant delays and significantly increasing the Special Master's fees and costs and the parties' attorney's fees and costs.

....

52. There were numerous and substantial conflicts in the evidence which the Court has been called upon to resolve in deciding this case. Rachel was a very credible witness.... Robert, on the other hand, was totally lacking in credibility. He repeatedly attempted to mislead the Court and its Special Master. Prior to trial, he attempted to hid[e] assets and otherwise acted to try and prevent the Special Master, his agents, and Rachel from discovering the true nature and extent of the marital estate and his expenditures, and to make it more difficult for the Court to transfer assets to Rachel.

[¶ 36] In light of those findings of fact, and in light of the specific grounding of Rachel's motion, the trial court should have addressed explicitly the issue of an award of attorney fees to the extent Robert's "actions unreasonably increased the time and effort spent on the dispute." *Mahoney v. Mahoney*, 1997 ND 149, ¶ 40, 567 N.W.2d 206.

D. Attorney Fees On Appeal

[¶ 37] Rachel requests an award of attorney fees on appeal because of the difference in the parties' earning capacities, the relative lack of merit in the appeal, and because, otherwise, her property will be diminished. We have often expressed a preference to have this issue addressed initially by the trial court. *Zuger v. Zuger*, 1997 ND 97, ¶ 38, 563 N.W.2d 804. We direct the trial court on remand to consider awarding attorney fees to Rachel for this appeal.

III.

[¶ 38] The judgment is reversed to the extent it fails to explicitly address the issue of an award of attorney fees to Rachel based on Robert's actions increasing the time spent on the dispute, and to the extent it distributes the parties' marital property based upon an improper valuation of KCI without retained earnings from 1997 revenue up to the end of the trial, and without including work in progress, prepaid expenses, and receivables not available to the special master in valuing KCI. The judgment and orders are otherwise affirmed. The matter is remanded for a redetermination of the value of KCI and a redetermination of the property distribution in light of the revaluation of KCI, for consideration of an award of attorney fees to Rachel for Robert's actions increasing the time spent on this dispute, and for a determination on Rachel's request for attorney fees on appeal.

[¶ 39] VANDE WALLE, C.J., and SANDSTROM and MARING, JJ., concur.

[¶ 40] The Honorable HERBERT L. MESCHKE, a member of the Court when this case was heard, retired effective October 1, 1998, and did not participate in this decision.